IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DIANA KURPIEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 11-165-GPM-CJP |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Diana Kurpiel seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to **42 U.S.C. § 423**.

## Procedural History

Plaintiff filed an application for DIB and SSI in July, 2008, alleging disability beginning on May 25, 2006.[1] After the application was denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) Stuart T. Janney. ALJ Janney denied the application for benefits in a decision dated February 25, 2010. (Tr. 11-21). The Appeals

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

-1-

Council denied review, and the February 25, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint.

## Issues Raised by Plaintiff

Plaintiff raises three issues:

(1)  The ALJ erred in discounting the opinions of her treating doctors, Drs. DeVenecia and Kostiuk.

(2)  The ALJ should have afforded controlling weight to her treating doctors' opinions.

(3)  The evidence establishes that plaintiff is disabled.

## Applicable Legal Standards

In order to receive DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3).** "Substantial gainful activity" is defined as work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be

conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).**   The Commissioner's burden at step five is to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** **Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Ms. Kurpiel was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of

-3-

credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that Ms. Kurpiel is insured for DIB through December 31, 2012, and she has not been engaged in substantial gainful activity since the alleged onset date. He found that she has severe impairments of degenerative disc disease, chronic pain, vascular disease status post varicose vein surgery, mild ischemic change of the brain, major depressive disorder and cognitive changes. He found that her condition does not meet or equal a listed impairment. He also found her testimony to be less than fully credible. Plaintiff has not challenged the ALJ's credibility findings.

The ALJ concluded that Ms. Kurpiel had the RFC to perform a limited range of work at the light exertional level. A VE testified that she was able to perform the jobs of mail room worker, sorter and cleaner, all of which exist in significant numbers in the national and regional economies. The ALJ accepted this testimony and found that plaintiff could perform those jobs and was therefore not disabled. (Tr. 11-21).

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.** **Agency Forms**

Ms. Kurpiel was born in 1955, and alleged that she became disabled on May 25, 2006.

(Tr. 154). She had a high school education with further training in occupational and physical rehabilitation. (Tr. 164). She had worked as a rehabilitation aid in a nursing home. (Tr. 160).

In a Disability Report dated October 8, 2008, plaintiff indicated she was 5'3" and weighed 156 pounds. (Tr. 158). She said that, in the last few months that she worked, her employer accommodated her need to take breaks to elevate her leg, and she could only work 4 hours a day. She stopped working on April 30, 2007, because she had an incident where she almost dropped a patient due to her own health problems. (Tr. 159).

**2.** **Medical Records**

In February, 2006, plaintiff had an MRI of her brain because of complaints of dizziness. It showed no acute ischemia, cortical infarction or cerebellar lesions. She did have mild microvascular ischemic changes in the cerebral white matter and slight prominence of the lateral ventricles. (Tr. 247-248).

Ms. Kurpiel received most of her medical treatment at Weber Medical Clinic in Olney, Illinois. Both Drs. DeVenecia and Kostiuk practiced there. Both doctors' notes are handwritten and somewhat difficult to read.

A note from Weber Medical Clinic indicates that plaintiff had varicose vein stripping surgery on her left leg at some point. (Tr. 228). There are no records from that surgery in the transcript.

On September 18, 2007, Ms. Kurpiel complained to Dr. DeVenecia of pain in her left hip and groin and burning pain in her hands. He suggested that she have a neurological evaluation at a university hospital, but she had no insurance. His assessment was sensory neuropathy. He prescribed Lyrica and told her to taper off Neurontin. (Tr. 235). She was doing better by October 5, 2007, but still had burning pain in her hands and had edema in her left leg. (Tr. 234). She was about the same on November 9, 2007. She had trace edema in her left leg along with

mild discoloration. Her gait was "OK." The doctor wrote that he did not have "much to offer her." They discussed Neurontin but she was unable to afford it. (Tr. 233).

In June, July and September, 2008, plaintiff continued to complain to Dr. DeVenecia of fatigue, sleepiness, achiness, pain in her left leg and groin, and nervousness. (Tr. 229-231). The doctor wrote a note addressed to "whom it may concern" stating that she was unable to work and needed "assistance with all her utilities." The note was dated July 2, 2008. (Tr. 240).

Dr. Kostiuk saw plaintiff on October 20, 2008, and noted that she complained of crying and sleeping a lot. She was worried about paying her bills. She went for short walks but did not get out much. She would get dizzy, lose her balance and fall. He diagnosed major depressive disorder and prescribed medications, including Lexapro. (Tr. 316).

In December, 2008, Ms. Kurpiel told Dr. DeVenecia that she had chest pain and burning in her heels at bedtime. She also complained of left leg pain. She had trace edema in the left leg. She was to continue her medications and increase her Neurontin. (Tr. 285).

Cardiac testing was done in January, 2009. A treadmill stress test and a myocardial perfusion study were normal. (Tr. 287-288).

In March, 2009, plaintiff complained to Dr. Kostiuk that she was feeling tired and "falling." She said that Cymbalta caused her to see fluorescent colors. Also, she felt like she knew what she wanted to say, but she had trouble expressing herself. He recommended neuropsychological testing, but she could not afford it. (Tr. 312).

On March 16, 2009, Dr. Kostiuk wrote "Catholic Charities - Wyeth Pharmaceutical Assistance Rx Pristiq 50 mg qd #90 ref x3" in the chart. (Tr. 312). (Pristiq is the brand name of a drug used to treat depression. See, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000449, accessed on March 5, 2012.)

On September 25, 2009, plaintiff was seen by a physician's assistant at Weber Medical

Clinic. She said that she had fallen on August 13, 2009, and began having low back pain and increased pain in her left leg about 2 weeks later. The pain in her low back and left groin was worse with standing on her feet. On examination, she had mild tenderness in her low back and over her left SI joint. She was able to walk and to stand on toes and heels. The PA discussed options with her such as having an MRI or EMG, or seeing a pain specialist. Plaintiff said she wanted to think about it due to lack of insurance. (Tr. 323). She returned to see Dr. DeVenecia on October 1, 2009. The doctor noted that her back was non-tender and she had a full range of motion of her left hip. Straight leg raising was negative. (Tr. 321).

### 3.     Consultative Examinations and RFC Assessment

Dr. Vidal Chapa performed a consultative physical examination on November 25, 2008. She gave a history of problems with the left leg since she was 17. She had surgery for varicose veins in the left leg in 2007. She said she had lesions in her skull. She complained of pain in her left leg and groin such that she could only walk 2 blocks. She had intermittent pain in the left side of her face and ear, and chest pain. On examination, the findings were unremarkable except for mild statis dermatitis on the left leg and scars on the left leg from her prior surgery. She had no swelling in her legs. She had no muscle spasms and straight leg raising was negative. She had a full range of motion of her joints and her lumbosacral spine, hand grip was full, and she could perform fine and gross manipulations with both hands. (Tr. 250-251).

On the same day, Stephen Vincent, Ph.D., performed a psychological examination. She had a noticeable limp on the left side and a mild tremor in both hands. She said that her depression began about 5 years earlier, and she had a fair response to medication prescribed by Dr. Kostiuk. She reported depressive symptoms such as feelings of hopelessness, helplessness, irritability and difficulty concentrating. On examination, she was oriented. Her speech was slow and underproductive. Her thought processes were slow and deliberate, yet logical, coherent and

relevant. She could remember 5 numbers forward and 4 backwards, and could spell a word forwards and back. She could do simple mathematical calculations. She could not interpret proverbs due to alleged inability to "think like that with all the pain I'm in." Dr. Vincent's impression was major depression and cognitive changes of unknown etiology. (Tr. 256-257).

A state agency consultant completed a Mental RFC Assessment in December, 2008. She concluded that Ms. Kurpiel was not significantly limited an any area of mental functioning except that she was moderately limited in her ability to understand, remember and carry out detailed instructions. In the narrative section of the report, the consultant suggested that she should be in a setting with limited social expectations, but said she was capable of one-to-two step unskilled work tasks. (Tr. 280-283).

A state agency physician completed a Physical RFC Assessment in December, 2008. He concluded that she was capable of a full range of work at the medium level. (Tr. 258-265). The ALJ rejected this assessment as not reflective of all of her limitations. See, Tr. 18.

**4.     Treating Doctors' Assessments**

Dr. DeVenecia completed a check-off form entitled Physician Questionnaire on August 3, 2009. He checked boxes indicating that plaintiff could stand for less than 30 minutes at a time and sit for 6 hours or more at a time. When sitting, she should elevate her to feet to "at or near knee level." He was unable to assess how much weight she could lift. He anticipated that she would miss more than 3 days of work a month and that she would need more than 1 extra break during the work day. She occasionally needed to use medicines which would interfere with her ability to concentrate or think. When asked for the reasons for her limitations, Dr. DeVenecia wrote that she had chronic pain and chronic dizziness, anxiety and depression. (Tr. 302-303).

Dr. Kostiuk filled out a form assessing plaintiff's mental limitations on January 22, 2010. He assessed her as "rarely, or no useful ability" in several areas, including ability to sustain an

ordinary routine without special supervision, perform at a consistent pace without an unreasonable number of breaks, and get along with coworkers. He rated her deficiencies of concentration, persistence or pace as "marked." He said that her symptoms are so severe as to interfere with her ability to perform tasks "constantly." He stated that the reason for her limitations was major depressive disorder. (Tr. 304-305).

**5.    Evidentiary Hearing**

The evidentiary hearing took place on February 11, 2010. Plaintiff was represented by counsel. (Tr. 39).

Ms. Kurpiel testified that she had surgery on her leg in September of 2007. After that, she tried to go back to work, but she fell at work and was afraid that she would injure a patient. (Tr. 57). She said she was unable to work because of chronic pain in her left leg, hip and groin. She also has severe pain in her hands and fingers, and is "off-balance" a lot of the time, which causes her to fall. She said that she falls once a week, at least. (Tr. 59). She has pain in her left leg every day for most of the day. Walking and standing makes it worse, and elevating the leg makes it better. She tries to elevate it above heart level every hour. (Tr. 60-61). She has not had physical therapy. She uses an Ace bandage or a stocking to keep her leg from swelling. She does not use a cane or a walker, but holds on to the furniture when she walks. (Tr. 61).

In response to questioning by the ALJ as to her functional abilities, Ms. Kurpiel said that she could walk for only 5 minutes due to balance issues. She could sit for an hour, then she has to elevate her leg for 20 to 30 minutes. She said that she is limited in using her hands and fingers. (Tr. 65-66).

Plaintiff testified that she also suffers from depression. She takes a number of drugs for that, which help some, but she still cries a lot. She has no side effects from the medications. (Tr. 66-67).

She has difficulty sleeping. At least one night a week, she does not sleep at all. She also has bad days when she stays in bed. In December, 2009, she stayed in bed for 22 days. (Tr. 68).

Plaintiff testified that her daily activities were very limited. She watches television and reads a little. (Tr. 69-72).

A vocational expert also testified. She testified that plaintiff's past work was medium to heavy and was semiskilled. The ALJ asked the VE to assume a person who was limited to light exertion, further limited to unskilled work consisting of one-to-two step tasks, with minimal close team work, only occasional unprotected heights and moving machinery, and no climbing of ladders, ropes or scaffolds. The VE testified that this person could not do plaintiff's past relevant work, but could do the jobs of mail room worker, sorter, and cleaner, which are unskilled and light, and which exist in significant number in the national and regional economies. (Tr. 75-78).

Plaintiff's counsel asked the VE to also assume that the person needed to elevate her foot for about half the time. The VE testified that this would preclude doing light work. (Tr. 79).

## Analysis

Plaintiff's first two points concern the weighing of the medical opinions. Her second point can be quickly dispatched. She argues that the ALJ erred in not giving controlling weight to the opinions of her treating doctors.

Plaintiff is arguing that the ALJ should have given controlling weight to the opinions of Drs. DeVenecia and Kostiuk regarding her functional abilities. She is incorrect. SSR96-8p instructs that the "RFC assessment must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, etc. SSR96-8p, at *5 (emphasis in original). Opinions of treating doctors regarding RFC are *not* given any special

weight because the issue of RFC is an issue that is reserved to the Commissioner. See, 20 C.F.R. §404.1527(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2. See also, **Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010)**.

The fact that the doctors' opinions were not entitled to controlling weight does not, however, dispose of plaintiff's first point. ALJ Janney was required to evaluate the opinions and determine what weight to give them considering the factors set forth in 20 C.F.R. §1527(d). An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §1527(d). **Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010)**, citing **Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010).**

Here, the ALJ did not give good reasons for giving "little weight" to the opinions of Drs. DeVenecia and Kostiuk, and he did not consider the checklist of regulatory factors.

ALJ Janney misconstrued Dr. DeVenecia's opinions. The ALJ rejected his opinions because they were not "consistent with objective findings." The only inconsistency he cited was how much weight plaintiff could lift. The ALJ said that Dr. DeVenecia said that she "may not lift any weight at all." The ALJ found that this limitation was belied by the fact that plaintiff carried out daily activities which would entail some lifting. (Tr. 18). However, the ALJ was wrong in saying that Dr. DeVenecia limited plaintiff to no lifting of any weight at all. The doctor actually wrote that he was "unable to assess" how much weight she could lift or carry. See, Tr. 302.

The ALJ's only other specific criticism of Dr. DeVenecia's opinion was that, "absent repeated, significant edema," the ALJ did not believe that plaintiff needed to elevate her foot while seated. (Tr. 18). The ALJ cited no medical evidence in support of this conclusion, and the record contains none. The only medical evidence on the subject was Dr. DeVenecia's statement that she should keep her foot elevated at or near knee level when seated. (Tr. 302).

The Commissioner misses the mark in defending the ALJ's decision on this point. He argues that plaintiff does not point to any evidence in the record that would support Dr. DeVenecia's opinion that she should elevate her leg. However, the treatment records documented episodes of swelling in plaintiff's left leg; whether that swelling was significant enough to require that she elevate her leg is a medical conclusion. An ALJ errs when he "plays doctor" and reaches his own independent medical conclusions. **Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009).** See also, **Chase v. Astrue, 2012 WL 258192, *2-3 (7th Cir. 2012)**, holding that the ALJ "overstepped his role" by determining that the plaintiff needed to elevate his foot to 15 to 20 degrees where the only medical evidence was the treating doctor's opinion that plaintiff's foot should be elevated to 90 degrees.

With regard to both Drs. DeVenecia and Kostiuk, the ALJ relied on his view that the limitations they assessed were not supported by the objective evidence. However, the treatment notes indicated that both of the doctors and a physician's assistant recommended testing and treatment that plaintiff declined because she had no insurance and no money. See, Tr. 233, 235, 312, 323. Thus, a plausible explanation for the lack of objective evidence was plaintiff's inability to get recommended testing and treatment. In assessing plaintiff's testimony, the ALJ noted that she did not have insurance, but also said that there was no indication of an attempt to get services at a reduced cost or for free. See, Tr. 18. In drawing this conclusion, the ALJ ignored Dr. Kostiuk's notation regarding Catholic Charities and Wyeth Pharmaceutical

Assistance Services. (Tr. 312). The ALJ asked plaintiff no questions at the hearing about whether she tried to get reduced cost or free services. This is in violation of SSR 96-7p, which says that the ALJ may not draw any inferences about the claimant's symptoms or limitations from a claimant's failure to seek treatment without first considering any explanation offered by the claimant or other information in the record that may explain the failure.

The ALJ's consideration of the medical evidence was legally insufficient. However, the record does not establish that the ALJ was, as is suggested by plaintiff in her third point, required to accept her treating doctors' opinions. There was conflicting evidence in the form of the opinions of the state agency consultants who examined her. It is for the ALJ to weigh the evidence pursuant to the regulations cited above and to resolve those conflicts. The fact that he failed to do so correctly does not mean that plaintiff is entitled to an award of benefits.

The ALJ's errors in weighing the medical evidence require remand. It should be understood that this Court is not making any suggestion as to whether plaintiff is, in fact, disabled or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can only be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is, itself, a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, ***Shalala v. Schaefer*, 509 U.S. 292, 296-298 (1993); *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate. Upon remand pursuant to sentence four, judgment must be entered. ***Shalala v. Schaefer*, 509 U.S. 292, 297-298 (1993)**.

### Recommendation

This Court recommends that Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **March 26, 2012.**

**Submitted:   March 8, 2012.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
